DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

DURING THE YEAR 1909.

---

Greene-Grieb-Sherman Company, Defendant in Error, v. John C. Quinlen Company, Plaintiff in Error.

## Gen. No. 14,391.

1. CORPORATIONS—*power to deal in corporate stock.* Corporations in this state are not authorized to purchase and own corporate stock but they may lawfully act as brokers or agents in the buying and selling of such stocks.

2. EVIDENCE—*how fair cash value of corporate stock established.* It is competent to establish, *prima facie* at least, the fair cash value of corporate stock by the testimony of a witness who has duly qualified as to his knowledge of such value.

3. CONTRACTS—*what question of interpretation for court.* Whether or not two transactions of sale and purchase are independent or not, is a question of legal construction to be determined by the court and not by the jury.

Assumpsit. Error to the Municipal Court of Chicago; the Hon. WILLIAM N. GEMMILL, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Reversed and remanded. Opinion filed March 26, 1909.

Statement by the Court. In the Municipal Court defendant in error sued plaintiff in error for breach of contract in failing to accept and pay for certain corporate stock purchased. Besides denying the breach of contract claimed, plaintiff in error presented a counter claim for loss of profit sustained because defendant in error had failed to deliver certain cor-

(1)

porate stock it had sold to plaintiff in error. Upon a trial before court and jury there was a verdict for $302.04 returned in favor of defendant in error, and a judgment was rendered upon that verdict. Plaintiff in error now prosecutes this writ to reverse that judgment.

Both parties are corporations and are stock brokers dealing in stocks not listed on any stock exchange. Plaintiff in error is an Illinois corporation, doing business in Chicago, and defendant in error is a Wisconsin corporation, doing business in Milwaukee, Wisconsin.

On September 19, 1907, plaintiff in error sent to defendant in error the following telegram:

"CHICAGO, ILL., Sept. 19th.

GREENE-GRIEB-SHERMAN CO.,
    45 Milwaukee Nat. Bank Bldg., Milwaukee.

We make you firm bid 2,000 Universal Pneumatic Transmission seventeen cents. Wire confirmation.

JOHN C. QUINLEN COMPANY."

Grieb, secretary for defendant in error, on the same day this message was received, called up plaintiff in error and stated that the stock could not be supplied at seventeen cents but it would be at seventeen and one-half cents and it was accepted at that price.

Thereafter, on September 20, 1907, defendant in error sent the following telegram to plaintiff in error, viz:

"September 20, 1907.

To JOHN C. QUINLEN CO.,
    Offer you 2000 additional Universal Pneumatic 17½.

GREENE-GRIEB-SHERMAN CO."

Upon which followed a reply and confirmation as follows:

"From CHICAGO, September 20, 1907.

To GREENE-GRIEB-SHERMAN CO.

We take 2000 additional Universal Pneumatic Transmission 17 1/2 confirm.

JOHN C. QUINLEN CO."

"From MILWAUKEE, September 20, 1907.
To JOHN C. QUINLEN.
Sold you 2000 additional Pneumatic Transmission
17 1/2.

GREENE-GRIEB-SHERMAN Co."

A telegram, which, from the evidence, clearly re-
lates to the 2000 shares additional, was also sent by
defendant in error to plaintiff in error, as follows:

"MILWAUKEE, WIS., Sept. 20th, 1907.
JOHN C. QUINLEN Co.
    Chicago, Ill.
In accordance with your wire order of the 20th inst.
we have purchased for your account and risk the fol-
lowing:  2000 shares Universal Pneumatic Transmis-
sion price 17 1/2c, total $350.00.

Faithfully yours,
GREENE & GRIEB COMPANY."

On the same day, plaintiff in error sent defendant
in error the following letter:

"September 20th, 1907.
GREENE-GRIEB-SHERMAN COMPANY,
    45 Milwaukee Nat. Bank. Bldg.,
        Milwaukee, Wis.
GENTLEMEN :—
Regarding 4000 Universal Pneumatic Transmission
at 17 1/2c which we bought of you, we should like to
have this in Chicago for delivery not later than Mon-
day morning early.
In case you cannot make delivery by that time, wire
us what day you can make delivery.  This is import-
ant.

Yours very truly,
JOHN C. QUINLEN COMPANY,
By J. C. Quinlen, Prest."

On the next day, September 21, 1907, defendant in
error sent plaintiff in error the following telegram
and letter relating to the forwarding or delivery of
the 2000 shares first sold:

"From Milwaukee, September 21st, 1907.
Shipping 2000 Transmission to-day balance next week * * *  .

Greene-Grieb-Sherman Co."

"Sept. 21st, 1907.

Messrs. John C. Quinlen Company,
  Chicago, Ill.
Gentlemen :—
  Replying to your favor of the 20th inst. we have to-day shipped two certificates of one thousand shares each Universal Pneumatic Transmission stock to the Central Trust Company, 152 Monroe Street, Chicago, with our sight draft on you for $350.00 attached. Kindly honor same promptly on presentation.

  Advice regarding the delivery of the additional 2000 shares which you have purchased from us has not been received as yet. However, we expect the stock Monday or Tuesday and will not delay in forwarding it to you. If you can use more stock at this price, please advise. * * *

Yours very truly,
Greene-Grieb-Sherman Co."

The 2000 shares were sent to The Central Trust Company, Chicago, on September 21, 1907, and with the stock was enclosed a sight draft upon plaintiff in error for $350. The instructions to the bank were to deliver the stock upon payment of the draft. The draft was never paid.

The following letters are self-explanatory:

"Sept. 25th, 1907.

The J. C. Quinlen Co.,
  Chicago, Ill.
Gentlemen :—
  Referring to your order for Universal Pneumatic Transmission stock, 2000 shares of which was forwarded to your bank on the 21st inst. we are at a loss to understand why our draft accompanying same is unpaid. Our obligation ends with the delivery of the stock at Chicago and we must expect you to promptly honor our drafts on presentation. We have 2000 shares more here, but we see no inducement to put our

money into this, unless we can secure prompt results. We have wired and telephoned you about this matter to-day, without securing a satisfactory explanation, which is rather a matter of surprise to us.

We urge your immediate attention to this.

Yours very truly,

GREENE-GRIEB-SHERMAN Co.''

''September 25th, 1907.

GREENE-GRIEB-SHERMAN Co.,
45 Milwaukee National Bank Building,
Milwaukee, Wis.

GENTLEMEN :—

Pursuant to the conversation you had with our firm over the phone to-day, we understand that you do not propose shipping the other 2000 shares Universal Pneumatic Transmission until you receive draft for $350.00 in payment of the first 2000, and as you informed us you cannot hold the stock 'for us until to-morrow and we being unable to take it to-day, we shall have to call the deal off.

We presumed when we bought the stock of you last week that you would be able to make delivery Chicago by Saturday, Sept. 21st, as we had promised it on that date and as we explained to you over the phone to-day our party has gone to New York and we did not presume there was any hurry in taking up the first 2000 shares, inasmuch as you had not completed the order, which was for 4000 shares.

Very truly yours,

JOHN C. QUINLEN COMPANY,
By J. C. Quinlen,

President.''

''Sept. 26, 1907.

MESSRS. JOHN C. QUINLEN Co.,
Chicago, Ill.

GENTLEMEN :—

Your favor of the 25th inst. is received and contents noted. We beg to state evidently you misunderstood our statement over the telephone yesterday as regards holding the 2000 shares over for you until to-morrow. We did not refuse such request and as far as we can recall, no such request was made of us; in

fact we were unable yesterday to secure a definite statement as to the time of payment of our draft. We did say, however, that we could not hold the matter open indefinitely and we do not understand on what grounds you expect us to do so. The relations between you and your clients are not of interest to us; our contract is with you and constitutes a cash sale. Your refusal to honor our draft upon presentation is a repudiation of the contract and your view of calling this deal off, upon our refusal to hold the matter open for a further length of time, is considerably out of line.

We regret that you presumed delivery would be made Saturday and we must state definitely that we did not lead you to make any such presumption and are not responsible for the results of such a presumption. We are rather surprised also at your presumption that there was no hurry in taking up the first 2000 shares, inasmuch as the entire 4000 had not been shipped. We wish you would appreciate that there is cause for hurry in honoring our drafts and you will undoubtedly comprehend this more readily if you will place yourselves in our position as shipper. As far as the completion of the order is concerned, we desire to state that these lots were purchased under separate dates and as far as our information goes, we were hardly in a position to take it for granted that the latter 2000 shares was the completion of the order of the previous day.

As stated to you over the phone to-day, the 2000 share lot will still be at your disposal at your bank to-day and in accordance with your promise, we expect that our draft will be paid promptly this morning. Regarding the latter 2000 shares, we also expect you to fulfill your contract with us and we are prepared to follow the shipping instructions which you stated would be furnished later in the day.

Yours truly,

GREENE-GRIEB-SHERMAN Co.''

Thereafter the draft was returned to defendant in error, protested for non-payment, and defendant in error sent a letter to plaintiff in error as follows:

"Sept. 27, 1907.

To THE J. C. QUINLEN Co.,
     Chicago, Ill.
GENTLEMEN :—

The 2000 shares Universal Pneumatic Transmission stock recently sold you was returned this morning with out protested draft. It is evident that you did not carry out your promise made to us by phone yesterday, that payment would be made the first thing yesterday morning. You also failed to give us further instructions regarding the 2000 shares, which we are holding here.

Your bank advises us that payment was refused because entire lot was not shipped. We cannot allow such a palpable misrepresentation to pass unchallenged, nor do we think your course in repudiating your contracts as either safe or prudent, for beyond the consequence of having such obligations fixed on you by the courts, the publishing of such facts will place you in a very unfavorable position as regards your clientage and connections. In order to continue a successful business it is essential that your record on your contracts be clean.

We do not desire to be hasty in a matter of this nature, but you must understand that you cannot throw a loss on to this office which is caused by your arrangements. We trust you will find a way to provide for the taking up of this stock promptly and will await your reply to this letter. If we do not receive a prompt reply we will take such action as we see fit in the case.

Yours very truly,
GREENE-GRIEB-SHERMAN Co."

Mr. Grieb testified that upon the return of the 2000 shares by the bank, be began looking around for a purchaser for those shares. He offered them to brokers and sent out letters. He tells us he saw or wrote to about twenty-five or thirty persons. He, later, somewhat stultifies himself and weakens his testimony by asserting he knew the market price through trades and offers made and then, when

8 APPELLATE COURTS OF ILLINOIS.

Greene-Grieb-Sherman Co. v. John C. Quinlen Co., 148 App. 1.

forced upon cross-examination, admitting he knew of none. However, on October 9, 1907, he sold these 2000 shares to one Frank H. Petrie, for ten cents per share. This, he testified, was the best and only offer he could get through all his efforts. With reference to the 2000 shares additional, as he testified, defendant in error obtained an option from one Rubly for those at sixteen cents per share, but this option was never availed of. The two Rubly transactions, the sale and the option, do not seem to have been given very much consideration by counsel as tending to show value of the stock.

Mr. Quinlen, on behalf of plaintiff in error, testified that the plaintiff in error was in business as broker in stocks and bonds and that this stock bought from defendant in error was bought for and on behalf of one Backus, a customer, and not for the plaintiff in error itself.

The court instructed the jury orally, *inter alia,* as follows:

"There is a point at issue here in reference to whether or not this 4000 shares was one sale or whether it was two separate sales, the defendant claiming that it was one single transaction, and that it was not required to pay for the first 2,000 shares until the second 2,000 shares should have been delivered.

"If you find that it was one single transaction, that the defendant should not pay for the same until the whole of the stock should have been delivered, then the refusal of the defendant to pay for the first 2,000 until the second 2,000 had been delivered would be justified under the law. But, on the other hand, if you find under the terms of this agreement, a communication between the parties, the defendant was to pay for the first 2,000 shares when it was delivered, then the refusal of the defendant to pay for this 2,000 shares when delivered would be a complete justification for the plaintiff in refusing to deliver the other 2,000 until the first 2,000 was paid for.

"Mr. Booth, attorney for defendant in error: Will

the court instruct the jury that even if they did find, as the defendant contends, that the sale was 4,000, that would not justify the defendant in refusing to accept the second tender of 2,000 shares?

"The Court: No, I think that is a correct statement of the law. The defendant would not be justified in refusing to accept the second 2,000 shares of stock under any conditions shown by the evidence in this case."

LEE, LEE & SCHUCHARDT, for plaintiff in error.

SHERMAN M. BOOTH, for defendant in error.

MR. JUSTICE CHYTRAUS delivered the opinion of the court.

It is perfectly clear that here there were two contracts, each for the sale of 2,000 shares of stock.

Plaintiff in error claims error in the judgment because both parties are corporations and were not, therefore, authorized to purchase and own corporate stock, and, consequently, the whole transaction was illegitimate. That is rather an unconscionable defense; yet, if supported by law and evidence, the court would be obliged to sustain it. But here it appears, with reference to the 2,000 shares first sold, that both corporations were merely acting as brokers or agents in buying and selling. They acted for undisclosed principals. There was no intent or purpose on the part of either party to become the owner of corporate stock; hence, the rule of law invoked is not here applicable.

As to the 2,000 shares sold first it must be conceded that, upon the record, the evidence is sufficient to prevent our disturbing the verdict of the jury for including in their verdict the difference between the purchase price of 17 1/2 cents and the price of 10 cents at which those shares were sold.

The point that there is a lack or insufficiency of competent evidence in respect to proof of damage is

not well taken. The stock involved was unlisted stock which has no recognized value upon any general stock market or exchange but, therefore, the plaintiff in a suit upon a broken contract of purchase is not without remedy. *Prima facie*, at least, the fair cash value thereof can be established by testimony of one dealing in such stocks and who qualifies himself as Grieb, the witness herein, qualified himself. Plaintiff in error made no effort to show that the fair cash value was other or different from what Grieb testified it was, and the plaintiff in error had a full and fair opportunity of so doing. By his testimony, in this respect, Grieb covered the time from the return of the stock until the day of sale, October 9, 1907.

With reference to the 2,000 shares additional, the evidence does not show the defendant in error to have lost 17 1/2 cents per share. The defendant in error cannot, as a mere broker in the transaction, justify a verdict for the difference between the purchase price of the plaintiff in error, viz.: 17 1/2 cents, and the price of 10 cents at which the other shares were sold to Petrie. According to the evidence the defendant in error was not acting as a broker in this transaction but was seeking to "scalp" a profit by itself making a purchase of Rubly, the owner, who was willing to sell at 16 cents and then selling to plaintiff in error, who was willing to buy at 17 1/2 cents. This we hold the defendant in error, as a corporation, could not do; for we understand the law to be that a corporation may not exist for the purpose of buying and selling corporate stock for its own use. The ordinary rule is that a corporation cannot become a stockholder in another corporation unless such power is given by its charter. Dunbar v. American Telegram Company, 224 Ill. 9. In the case at bar defendant in error did not show itself to possess such charter power. The law of this state prohibits defendant in error from making or availing itself of the transaction with reference to the 2,000 additional shares and plaintiff in

error is not and never was obligated to aid or enable defendant in error to carry it out.

The instruction of the trial court first quoted above is erroneous, because the two transactions of sale and purchase were independent, not interdependent. The question whether or not they were so, being a question of construction or interpretation of a contract, was a question for the court and not for the jury. Gettys v. Marsh, 145 Ill. App. 291. The instruction last above quoted, relating to the 2,000 additional shares, is also erroneous. It practically amounts to a direction of a verdict in favor of defendant in error, except in amount, so far as those shares are concerned.

What has already been said disposes of the counter-claim made for damages because defendant in error did not deliver stock purchased.

The judgment of the Municipal Court is reversed and the cause remanded.

*Reversed and remanded.*